UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA BROOKS, *et al.*,

        Plaintiffs,                  Case No. 11-CV-11551
                                                             HON. GEORGE CARAM STEEH

vs.

DETROIT BAPTIST MANOR, *et al.*,

        Defendants.
_____/

OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT (DOC. # 62), DENYING AS MOOT PLAINTIFFS' MOTION TO STRIKE
EXHIBIT 1 TO DEFENDANTS' REPLY BRIEF (DOC. # 78), and
DENYING DEFENDANTS' EX PARTE MOTION TO STRIKE UNTIMELY AND
IMPROPER FILING OF EXHIBIT TO PLAINTIFFS' RESPONSE BRIEF (DOC. # 76)

**INTRODUCTION**

      Plaintiffs, three African-American women who are former employees of the Detroit Baptist Manor (DBM), brought this lawsuit against DBM and their supervisor there, alleging claims of race discrimination under Title VII; 42 U.S.C. § 1981; and Michigan's Elliot-Larsen Civil Rights Act (ELCRA). Two of the three plaintiffs also allege state law claims of defamation. Defendants moved for summary judgment as to all claims. Oral argument on the motion was heard September 25, 2012. Because the court finds that plaintiffs have presented sufficient evidence to make their prima facie cases and create a question of material fact as to whether defendants' termination explanations were pretextual, defendants' motion for summary judgment is DENIED. The parties' motions to strike exhibits are also DENIED as set forth below.

-1-

**BACKGROUND**

The three plaintiffs in this lawsuit are Debra Brooks, hired as an administrative assistant at DBM in April 2008; Taunni Sanders, hired as DBM human resources director in August 2007; and Angel Slayton, hired in April 2002 to work in DBM's accounting department and later promoted to the position of finance director. Defendant Elizabeth Goleski, a Caucasian woman, is Executive Director for defendant DBM, which operates a group of housing facilities for senior citizens. The DBM administrative offices are contained in one central location, referred to by the organization as the "front" or "central" office. All three plaintiffs reported to Goleski, who in turn reported to the DBM Board of Directors. Goleski hired all of the plaintiffs and was responsible for Slayton's promotion.

Goleski terminated the employment of Sanders and Slayton on September 11, 2009, and terminated Brooks upon her return from time off three days later. Goleski gave no reason for the terminations, other than to indicate they were "at will."[1] At the time of their termination, plaintiffs were the only African-Americans working in the central office. The three positions were then filled with two Caucasians and one individual described as being of Indian heritage. Brooks, Sanders, and Slayton all filed complaints with the EEOC on the dates they were fired, alleging claims of

---

[1]Plaintiffs point out that while the DBM "Employee Handbook" states that employment is "at will," the handbook also includes a progressive disciplinary policy, and states that "[d]ischarge will be used only as a last resort when reasonable efforts have failed to remedy those situations...." Handbook at p. 37. The handbook also contains the following statements: "Every reasonable effort should be made to retain productive and capable employees, and ensure that fair and consistent treatment is used when conditions seem to warrant separation of an employee. An employee who is leaving the Baptist Manor should be properly counseled," *id*. at 31, and "[e]mployees generally should not be terminated for poor performance, disciplinary problems (excluding serious misconduct), absence or tardiness, without prior warning...[i]n most cases the warning should be preceded by a series of disciplinary steps in which specific areas requiring improvement are communicated to the employee," *id*. at 32.

employment discrimination on the basis of race under Title VII. More than a year later, the plaintiffs withdrew their charges pending with the EEOC, were issued "right to sue" letters, and filed suit in federal court, alleging claims under Title VII, § 1981, and Michigan law. Plaintiffs Sanders and Slayton also asserted state law defamation claims.

Plaintiffs make a number of common allegations. For instance, each asserts that she was never subjected to any disciplinary action or write ups while at DBM. All of the plaintiffs also commonly allege that Goleski often made racially biased comments. According to plaintiffs, examples of such comments include Goleski's references to African-American employees as "ghetto," "thugs," and/or "thieves;" accusations of petty theft against "black employees;" comments about "black" employees having "multiple baby daddies;" and statements that African-American employees were "system workers." Brooks also attested that Goleski made general statements about her fear of Detroit and getting lost in the "wrong" neighborhood.

Some more specific examples given by the plaintiffs include Sanders' assertion that Goleski told her not to use the "Michigan Works" website to find job applicants, for the reason that it drew only "welfare recipients" and that such applicants were "ghetto." Sanders also stated in her declaration that another management employee told her that Goleski had hired Sanders to "weed out the blacks." In plaintiff Brooks' declaration, she stated that on numerous occasions, Goleski referred to the Detroit HUD office as the "Kwame Kilpatrick bunch." Brooks also stated that Goleski made disparaging remarks about President Obama, stating that he was a Muslim and was going to ruin the country. Brooks stated that when she told Goleski that Obama was not Muslim, Goleski responded that "it didn't matter," because a black man would never be president. Sanders also included information in her declaration that Goleski told her other employees were afraid of plaintiff Slayton,

who Goleski described as "black and mean," and that Goleski called Slayton's son "little Malcolm X" in a derogatory fashion.

Plaintiffs further allege that during the months preceding their terminations, Goleski was displaying anxiety over what she believed was a conspiratory allegiance between the three plaintiffs. Both Sanders and Slayton testified at deposition that Goleski told them Brooks was racist and that she felt like "the white girl out." Plaintiffs also testified that Goleski accused the three plaintiffs on multiple occasions of "having something going on," and being "up to something" (Plaintiffs' Response Brf. at 7-8 (citing to depositions)). Slayton and Sanders testified that they were contacted by DBM Director of Plant Operations Paul Doelle on the morning of their termination. They stated that Doelle told them that Goleski had kept him on the telephone for "hours" and "all night," respectively, saying that Sanders, Brooks, and Slayton had a "conspiracy" against her and that "heads were going to roll" when she came in the next morning. (*Id*. at 8, citing to Slayton Dep. at 25-26, Sanders Dep. at 67-68.)

Plaintiffs also allege that Goleski engaged in additional acts and/or made other statements which they contend reveal disparate treatment, race-based manipulation, and illegal retaliation, such as accusing an African-American employee of stealing without any evidence while retaining a Caucasian employee who stole medications. Some additional examples alleged by the plaintiffs are discussed in the analysis section, below, in the context of each of the plaintiff's claims.

Defendants filed for summary judgment as to the complaint in its entirety on July 9, 13, 2012. In the motion, with respect to plaintiffs' Title VII claims, defendants first assert that there was no exhaustion of administrative remedies. They present an alternative, fact-based argument on the Title VII claims that they are entitled to judgment as a matter of law on plaintiffs' claims of both a

hostile work environment and discriminatory termination.[2]  Defendants assert the foregoing argument also applies to resolve the § 1981 and ELCRA claims in their favor.  Finally, defendants argue that Slayton and Sanders cannot establish a *prima facie* case of defamation.  The court's determinations and ruling on the motion are set forth below.  After briefing was completed, each of the parties requested that the court strike an exhibit presented by the other side; these motions are also resolved below.

## ANALYSIS

### Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001).  The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice.  The procedure is not a disfavored procedural shortcut.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477

---

[2] Plaintiffs state in their response brief that they have neither pled nor asserted claims of a hostile work environment or racial harassment, so the court will not address these issues.

U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see* also *National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

**<u>Race Discrimination</u>**

**<u>Exhaustion of Administrative Remedies</u>**

42 U.S.C. § 2000e-5 requires the pre-suit exhaustion of administrative remedies.  Title VII and associated regulations allow for the filing of charges of discrimination with either the Equal Employment Opportunity Commission or certain state agencies which investigate and enforce parallel state civil rights laws.  See 42 U.S.C. § 2000e-5(c)-(e); 29 C.F.R. § 1601.74.

Defendants contend that plaintiffs, who withdrew their charges pending at the EEOC, waived the right to bring claims under Title VII for the reason that they failed to meet the exhaustion requirement. However, plaintiffs point out that under Title VII itself, after waiting 180 days, a plaintiff may pursue a civil action in court without waiting further for final administrative action. 42 U.S.C. § 2000e-5(f)(1).

Unlike the case of Dillard v. Inalfa Roofing Systems, 2006 WL 2375701 (E.D. Mich. 2006), relied on by defendants, the plaintiffs in the instant case did not withdraw charges pending with the EEOC until nearly one full year after the 180 day statutory waiting period was already over. Right to sue letters issued soon after that. The record demonstrates that these plaintiffs fulfilled the pre-suit requirements established under Title VII. Accordingly, defendants' argument is without merit.

## **Substantive Claims**

Under Title VII, it is an "unlawful employment practice for an employer ... to discriminate against any individual ... because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-(a)(1). When there is no direct evidence of intentional discrimination on the basis of race, as in the instant case, the court analyzes the case under the *McDonnell Douglas* burden-shifting paradigm.[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

---

[3]Plaintiffs offer evidence that Goleski stated that she was the "white girl out," and that the plaintiffs were "up to something," and assert that these statements are direct evidence of race discrimination. Evidence is considered direct when, if such evidence is believed, "'requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012) (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). The plaintiffs have not provided evidence that Goleski made such statements concerning race in explaining, describing, or justifying her decision to terminate their employment. The court finds neither the requisite connection to the termination decision nor sufficient proximity in time to consider this evidence to be direct.

Under the *McDonnell Douglas* analysis, the plaintiff must first establish a *prima facie* case of discrimination. To do this, the plaintiff must show that "(1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably." *Vincent v. Brewer*, 514 F.3d 489, 494 (6th Cir. 2007); *see also Lytle v. Malady*, 458 Mich. 153, 173 n.19 (1998).

If plaintiff makes her case, the burden of production shifts to defendant to offer evidence of a "legitimate, nondiscriminatory reason for its action." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). If defendant meets that burden, the burden shifts again to the plaintiff to "identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* At the summary judgment stage, the Michigan ELCRA is evaluated by Michigan courts in the same manner as Title VII. *Harrison v. Olde Fin. Corp.*, 225 Mich.App. 601, 609-10 (Mich.Ct.App.1997). The same analysis applies to § 1981. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

In the instant case, defendants first contend that plaintiffs cannot establish their *prima facie* cases. Defendants "do not dispute that Plaintiffs were members of a protected class or that they suffered an adverse employment action." (Defendants' Brf. At 23.) It is the third prong of plaintiffs' *prima facie* cases under *McDonnell Douglas*--that they were qualified for their positions–that defendants assert they cannot demonstrate, due to each of the plaintiffs' behavior and/or job performance.[4] Defendants alternatively argue that even if plaintiffs are found to have

---

[4] Although defendant's counsel did not expressly concede the fourth prong at oral argument, there appears to be no serious dispute concerning the fourth prong, i.e. that plaintiffs were replaced by workers not of the protected class, and the court finds no question of material fact on this issue.

-8-

established their *prima facie* cases, they cannot establish that the nondiscriminatory reasons given by defendants are pretextual.  Because each plaintiff presents a different combination of factual allegations and legal arguments, the court will look at each plaintiff in turn in analyzing her discrimination claims.

**Debra Brooks**

Plaintiff Brooks served in the position of administrative assistant at DBM for approximately 16 months.  Defendants contend that Brooks was terminated for poor performance and a "hostile" attitude.  In support of this position, defendants cite to the deposition of DBM Property Manager Zanavich, and assert that Brooks refused to put postage on Zanavich's mail, hung up on her during a phone call, and threw a supply book at Zanavich when she asked for office supplies.  Defendants also point to Sri Nistala's testimony that Brooks refused to affix postage to her mail, and Goleski's testimony that Brooks displayed poor behavior toward a Board member, failed to answer telephones on frequent occasions, disappeared for periods of time, and made frequent personal calls.  Goleski stated that she discussed these issues with Brooks, memorialized them in writing, and asked defendant Sanders (in her capacity as human resources director) to place the memos in Brooks' personnel file, which did not occur.

Plaintiffs assert that at the time they filed EEOC charges, defendants answered only by pointing to poor performance and an unprofessional attitude, and highlighted a "close relationship" Brooks had with defendant Sanders, accusing Brooks of discussing confidential employee information with the other plaintiffs and stating that Sanders had removed write-ups from Brooks' personnel file.  Plaintiffs contend that since that time, defendants have manufactured post facto reasons for Brooks' termination, by including an affidavit by Kathy Zanavich attesting to Brooks' "rude" behavior, and pointing to a letter addressed to Brooks as DBM's "Assistant Executive

Director" (rather than "assistant to" the executive director) from the Michigan Department of Civil Rights.[5] Defendants cite the letter as evidence that Brooks misrepresented her title, although Brooks denies doing so. Furthermore, plaintiffs state that Brooks received no complaints about her performance, that her record included no "write-ups or disciplinary action of any kind," and that within months prior to Brooks' termination, Goleski had offered her a promotion.

In reply, defendants generally contend that plaintiffs' citations to "ambiguous, stray remarks, having nothing to do with race" do not permit this court to infer a discriminatory motive on the part of Goleski. Defendants dispute that plaintiffs' evidence amounts to any substantive proof sufficient to survive their motion for summary judgment.

The court is satisfied that Brooks has established a *prima facie* case of race discrimination in employment, by presenting sufficient evidence on the contested issues. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (district court's role here is "determin[ing] if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the *prima facie* requirements"). In turn, defendants have provided a race-neutral explanation for her dismissal, pointing to unsatisfactory performance and behavior issues while in her job at DBM. However, the court finds there are questions of fact as to whether the race-neutral explanation was the basis for the termination.

While defendants have pointed to pieces of evidence supporting an argument that Brooks had performance issues, plaintiffs also offer evidence that performance issues could not have been the reason for Brooks' termination. Such a determination is supported by the coincidental

---

[5]As plaintiffs point out, Zanavich testified only that Brooks "tossed" a book onto the desk in front of her. There does not appear to be support for the allegation that Brooks threw a book at Ms. Zanavich.

-10-

circumstances of the plaintiffs' dismissal,[6] in combination with additional evidence pointed to by plaintiffs concerning Goleski's actions and statements; the lack of any documentation of warnings or discipline; the after-the-fact explanations by defendants for the action; and the testimony of witnesses whose recollection varies from that of Goleski. For instance, while Goleski testified at deposition that Brooks misrepresented her position with DBM, and gave the misrepresentation as a reason for terminating Brooks, Brooks denies doing so.[7] Moreover, Goleski also testified that she never discussed the allegedly falsified title with Brooks, and appears to have come up with only an unsubstantiated explanation for how the title appeared on the envelope.

This is a case rich in facts, and while this opinion does not begin to address each of the issues/disputes addressed in the briefs, the court will note generally that plaintiffs have highlighted a number of additional problems with the defendants' proffered reasons for finding Brooks' performance to be unsatisfactory. As plaintiffs argue, "a *prima facie* case plus sufficient evidence of falsity may permit the trier of fact to conclude that the employer unlawfully discriminated," citing *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003). Under the circumstances of this case, the court is satisfied that there is a question of material fact as to whether the defendants' explanation for Brooks' termination is pretextual.

---

[6]Defendants assert that from July-September 2009, "DBM employed 33 African Americans, 35 Caucasians, 5 Hispanics, and 7 Asian/Pacific Islanders," arguing that these numbers make the coincidental termination of the plaintiffs less significant. Plaintiffs, on the other hand, emphasize that they were the only African Americans in the front office.

[7]This assertion stemmed from the envelope from the Michigan Department of Civil Rights addressed to Brooks as "Assistant Executive Director," rather than "Assistant to the Executive Director."

**Taunni Sanders**

Similar to the explanation for Debra Brooks' termination, defendants assert that Sanders was terminated because of "her continually declining performance at DBM." (Defendants' Brf. At 5.) Defendants cite specific examples, such as sending certain employees for a pre-employment physical when it was not required; misinforming a new employee about the wait time to receive direct deposit; and similar administrative errors which occurred due to Sanders' "disorganization." Defendants also cite to unprofessional behavior on the part of Sanders during the months leading up to her termination.

In addition to the behavior issues pointed to by defendants, Goleski testified that she became aware four months prior to the plaintiffs' termination that Sanders was omitting Goleski's notes made after counseling sessions concerning Brooks' and Slayton's job performance, and tipping off other employees with the substance of conversations she had with Goleski about them. Defendants also assert that Sanders told other employees the amounts of Goleski's salary and bonus. They also point to the testimony of Paul Doelle that Sanders referred to Goleski as a "crazy bitch," and Goleski's testimony that she knew Sanders told other employees that Goleski was "full of shit."

Plaintiffs cite to the record evidence to demonstrate that the specific administrative errors cited above, stated by defendants for Sanders' termination, were not known to Goleski at the time she fired Sanders. Concerning Goleski's salary and bonus, plaintiffs show that two of the three employees who had "confirmed" the information denied at their depositions that they had heard any such thing from Sanders, and the other–Paul Doelle–did not tell Goleski until a month before his deposition in the instant case, which means Goleski could not have known it at the time of Sanders' termination. Plaintiffs also cast doubt (in various ways) onto the defendants' allegations concerning the language used by Sanders, and point to evidence to demonstrate that even if Sanders said such

-12-

things, they could not have motivated the employment action. Plaintiffs additionally dispute that Goleski ever gave Sanders notes to put in others' files, and highlight the fact that Goleski has produced no documentation, from her computer or elsewhere, that such write-ups were actually produced.

The court has considered what plaintiffs argue are after-the-fact reasons, in combination with evidence that Sanders was qualified for her position, as well as evidence concerning both the circumstances of the plaintiffs' termination and acts and statements of Goleski. While the recollection of past events by a group of people will always include a certain amount of inconsistency and disconnects, the instant case involves enough to cast additional doubt onto the defendants' explanation. Citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993), the Sixth Circuit has just confirmed that "evidence that the employer's proffered reason for the termination was not the actual reason thus does not mandate a finding for the employee, *Hicks*, 509 U.S. at 511, but is enough to survive summary judgment." *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012) (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007)). That instruction is on point here.

Accordingly, the court finds that plaintiff Sanders has made a *prima facie* case of race discrimination in employment, and that a material question of fact exists as to whether the race-neutral reason given by defendants for her termination was actually pretext. Defendants are thus not entitled to summary judgment on Sanders' race discrimination claims.

**Angel Slayton**

Defendants again point to poor "performance on the job and her blatant disregard for DBM policies and procedures, as well as her poor attitude," as reason for Slayton's termination. Defendants assert that Slayton and Goleski had a formerly close relationship that had deteriorated,

-13-

and allege Slayton's failure to follow through with tasks for grants applications among other employment improprieties, and contend that none of these facts, which contributed to the termination decision, had to do with race.[8]

In contrast, plaintiffs demonstrate that the "reasons" pointed to by defendants are both after the fact and inaccurate. For instance, plaintiffs assert that the defendants produced a document entitled "Accounting Department Discrepancies" for the first time in October 2011–a document which was not in Slayton's personnel file, not a part of the EEOC record, and not even created until April 2010. Plaintiffs also highlight the date of a letter produced by defendants (March 2010) and point out that neither document could have been relied upon by Goleski in making the termination decision. Plaintiffs also point to Slayton's email account, and note the existence of emails to rebut the accusations leveled by Goleski concerning the grant submissions. For instance, plaintiffs contend that certain emails reveal that Slayton requested extensions and submitted forms in connection with the referenced grants, including one DBM described as "lost" due to Slayton's inaction.[9]

As with the other plaintiffs, the question of Slayton's continued qualification for her position–i.e. her performance and behavior on the job– comes down to an assessment of credibility and a weighing of the evidence. The same can be said for whether the defendants' asserted explanation for her termination is pretextual. Because "credibility determinations, the weighing of

---

[8]Defendants note that Slayton's family members, including her husband and son, are or were employed by DBM, and suggest that Goleski's efforts to counsel Slayton's son on personal matters and discuss those efforts with Slayton "enraged" Slayton, contributing to the deterioration of the relationship between Goleski and Slayton.

[9]Plaintiffs highlight that when Slayton produced documents to rebut Goleski's assertions, Goleski speculated that Slayton "hacked" into the DBM computer system after her termination to create backdated documents. Slayton has denied doing so.

the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), summary judgment for defendant is also not appropriate as to Slayton's employment discrimination claims.

## State Law Defamation Claims

As noted above, Sanders and Slayton also advance state law claims of defamation. Under Michigan law, the four elements of a *prima facie* case of defamation are: (1) a false and defamatory statement; (2) publication to a third party; (3) fault–negligence at a minimum–in publishing the statement; and (4) "either actionability of the statement irrespective of special harm (defamation per se) or...special harm caused by publication (defamation per quod)." *Colista v. Thomas*, 241 Mich. App. 529, 616 N.W.2d 249, 254 (2000).

Sanders asserts that Goleski defamed her by telling EEOC investigators, the attorneys representing the parties in the instant case, as well as Sri Nistala and James Darby, that Sanders stole and/or destroyed personnel files. Slayton asserts that Goleski told others that Slayton was fired for misconduct, and that Slayton had threatened to kill her with a gun following the termination.

Defendants contend that they are entitled to judgment on these claims, asserting that Sanders and Slayton cannot establish any of the elements of their *prima facie* cases. Although defendants assert that Goleski's alleged statements were in fact true, plaintiffs' own testimony disputes the truth of the statements. Whether or not privilege applies to statements Goleski made in connection with EEOC proceedings and this lawsuit, plaintiffs have offered evidence that she provided defamatory information to former co-workers as well. It appears to the court that if a jury determined such statements were made as plaintiffs assert they were, it could also find the statements to have been made with malice and not as a part of Goleski's supervisory role with DBM, so the court cannot find

that a qualified privilege applies to such statements. These claims will also survive defendants' motion.

**Defendants' Ex Parte Motion to Strike Untimely and Improper Filing of Exhibit to Plaintiffs' Response to Defendants' Motion for Summary Judgment (Document # 76)**

In this motion, defendants move to strike Exhibit G to the plaintiffs' response brief. Exhibit G is a declaration made by Thomas Engel, a former DBM employee, declaring that a letter he wrote (attached as Exhibit H to the plaintiffs' response brief) was authored by him and is true. Engel signed the declaration on August 10, 2012, three days before plaintiffs' response was due. Yet plaintiffs did not file the declaration until two days after defendants' brief in reply was due and filed. For this reason, defendants seek to strike the declaration, provided as a foundation for the letter's admission.

Plaintiffs' response to defendants' motion explains that the late filing of the declaration was an oversight, and notes that the Engel letter has been a part of the record in this litigation for some time. This explanation is bolstered by the fact that the Engel letter itself was attached to the defendants' response brief as Exhibit H, with an empty exhibit slot just before it, obviously reserved for the subject declaration. Defendants argue in a footnote to their reply that the Engel letter is hearsay; however, they do no assert any prejudice in its consideration by the court. While much of the information in the letter is duplicative of other record evidence, and the letter did not tip the balance with regard to the court's decision here, the court, in its discretion, does not find reason to strike the late-filed declaration. Defendants' motion is hereby **DENIED**.

**Plaintiffs' Motion to Strike Exhibit 1 to Defendants' Brief in Reply to Response to Motion for Summary Judgment (Doc. # 78)**

In this motion, plaintiffs request the striking of Exhibit 1 attached to defendants' reply brief. Defendants attached a memo/letter entitled "documentation of events," dated April 25, 2005, which appears to be authored by Angel Slayton. The letter recounts and arguably rebuts other individuals' allegations of bias on the part of DBM/Goleski. Plaintiffs contend that the letter was not produced either as a part of the defendants' Rule 26 disclosures, in discovery, or in connection with Slayton's deposition, and that it has not been authenticated. Defendants, in turn, assert the document is admissible as a party admission.

While the court reviewed the subject document, it did not factor either way in the court's determination on the motion. Therefore, the court **DENIES AS MOOT** the motion and reserves judgment on its admissibility at trial.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is **DENIED**. The parties' motions to strike exhibits are also **DENIED** (Doc. # 76) and **DENIED AS MOOT** (Doc. # 78) as set forth above.

The docket reflects that the parties have a settlement conference with Magistrate Mazoub on the formerly scheduled November 27, 2012 trial date. The parties shall promptly contact the court following that conference for status and/or scheduling purposes.

IT IS SO ORDERED.

Dated: October 10, 2012

                                                s/George Caram Steeh
                                                GEORGE CARAM STEEH
                                                UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 10, 2012, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk